UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BRIAN BLAKE NEIHAUS                                                                    PLAINTIFF

V.                                                              CIVIL ACTION NO. 3:13-cv-992-LRA

THE GEO GROUP, INC., ET AL.                                                       DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This cause is before the Court on the Motion for Summary Judgment filed by Defendant Dr. Carl Faulks [49], the Motion for Summary Judgment filed by Defendant Management & Training Corporation ("MTC") [51], and the Motion for Summary Judgment filed by Defendant GEO Group, Inc. ("GEO") [58]. In support of their motion, Defendants submitted Plaintiff's authenticated medical records, which have been considered by this Court. The Court has also considered the sworn testimony of Plaintiff given at the November 5, 2013, omnibus hearing. Having considered the entire record in this matter, the undersigned finds that Defendants' motions are all well-taken and are granted for the following reasons.[1]

**I. Background**

Plaintiff, who is proceeding *pro se* in this litigation, brought this lawsuit pursuant to 42 U.S.C. § 1983, challenging the conditions of his confinement. Specifically, Plaintiff alleges that while he was housed at East Mississippi Correctional Facility ("EMCF") in

---

[1]The parties consented to the undersigned deciding this case. [37].

1

Meridian, Mississippi, he was unconstitutionally denied medical care [1]. The Court held an omnibus or *Spears* hearing[2] in this matter on November 5, 2013, at which Plaintiff was afforded the opportunity to fully explain his claim under oath.

Plaintiff testified that his right testicle swelled to the size of a softball sometime around June 1, 2012. [51-2] at 6. He claims that he put in a sick call, but got no response. His testicle kept swelling and then going down and was very painful. He asked case managers, mental health counselors, and anyone else who would listen, to please get him help. Everyone he asked instructed him to put in a sick call.

According to Plaintiff, when his testicle first started swelling, the facility was on lockdown. He and his roommate were finally allowed out on the recreation yard on or about July 13, 2012. [51-2] at 7. So that he could get medical attention, Plaintiff refused to come back inside. A guard told him that if he would return to his cell, an attempt would be made to get him immediate treatment. Plaintiff complied and was taken almost immediately to the doctor, Dr. Holland. *Id.* at 7-8. Dr. Holland examined Plaintiff and determined that Plaintiff needed an ultrasound; he ordered a urine test and prescribed Ibuprofen for pain. GEO was managing EMCF at the time, but Plaintiff alleges that he knew MTC was supposed to take over managing the prison less than a week later. Plaintiff asked Dr. Holland if the change in management would cause a delay, and Dr. Holland assured him that it would not. *Id.* at 8.

---

[2]*See Spears v. McCotter*, 766 F.2d 179, 180 (5th Cir. 1985).

Apparently, the change in management did cause a delay. Plaintiff testified that on August 8, 2012, he again refused to be locked down, so he could get to a doctor again. This time Plaintiff was taken to see Defendant Dr. Faulks. *Id.* at 8-9. According to the medical records, Dr. Faulks examined Plaintiff and noted tenderness of his right testicle. [51-3 at 5]. He diagnosed Plaintiff with epididymitis, which causes testicular inflammation, redness, and pain. *Id.* Plaintiff's records also confirm that Plaintiff has a documented family history of epididymitis; his brother had been diagnosed with epididymitis on two occasions. [51-3 at 13]. Dr. Faulks prescribed an anti-inflammatory and pain reliever, Indocin 50mg twice daily for two weeks, and antibiotic Doxycycline 100 mg twice daily for two weeks. *Id.* He also prescribed three doses of Ibuprofen until the Indocin came in. *Id.* Dr. Faulks ordered that Plaintiff should return to clinic in one week and at that time Dr. Faulks would schedule an ultrasound. Plaintiff asked about the previously ordered ultrasound, but Dr. Faulks told Plaintiff that he would prescribe medicine first.

According to Plaintiff, the pharmacy did not get him the medication for two weeks. He then took the medicine for two weeks, but it did not help. Plaintiff started putting in sick calls and was seen again by Dr. Faulks on September 6, 2012. He told Dr. Faulks that he had completed the prescribed medication without improvement. [51-3 at 13]. Dr. Faulks ordered an ultrasound and prescribed the anti-inflammatory Naprosyn 500mg twice daily for 30 days for the pain and swelling. According to Plaintiff, Dr. Faulks told him that they would have to set him up with a urologist and get an ultrasound, but it might take

six months. [51-2 at 10]. Plaintiff claims to have begged Dr. Faulks to get him in faster, but Dr. Faulks told him: "This is prison. What do you expect?" *Id.*

Yet, only about two weeks later, on September 24, 2012, Plaintiff had an ultrasound. On October 17, 2012, Dr. Faulks received results of the ultrasound indicating testicular cancer. [51-3 at 21]. Plaintiff also received the results the same day, learning that he had testicular cancer, about three weeks after the ultrasound was taken. [51-2 at 11]. Plaintiff was then taken to a urologist, Dr. Moore, less than three weeks later, on October 23, 2012. Dr. Moore recommended that Plaintiff's right testicle be removed. Plaintiff underwent the surgery on October 26, 2012, to remove the testicular mass; the surgery was completed without incident or complication. [51-4 at 7-8]. On November 1, 2012, Plaintiff had a CT scan of the chest, abdomen, and pelvis. [51-4 at 6]. The CT scan revealed a "single pathologically enlarged lymph node," in his abdomen but was otherwise noted to be a "normal CT . . . with no metastatic disease." [51-4 at 6]. He was referred to Dr. Morris, an oncologist.

Dr. Morris discussed with Plaintiff the appropriate treatment options for the singular affected lymph node: either lymph node dissection or chemotherapy. [51-5 at 10]. Dr. Morris also advised Plaintiff that the dissection may be necessary even after chemotherapy had been completed. [51-5 at 10]. Following discussion of the treatment options, Plaintiff elected chemotherapy treatment. [51-5 at 17]. He started chemotherapy on December 10, 2012, but claims he could not get anti-nausea medication when he needed it. *Id.* at 12. However, his medical records indicate that on December 16, 2012,

4

Dr. Faulks prescribed anti-nausea medication Phenergan 25mg 1-2 tablets twice daily for 10 days, and he ordered an injectable (shot) form of Phenergan for acute nausea/vomiting as needed. [51-3 at 28]. Dr. Faulks also indicated his concern about Plaintiff's compromised immune system and risk for infection, and he ordered that Plaintiff be housed in the medical unit so that he could be properly treated for his chemotherapy symptoms including nausea/vomiting, as well as prevent exposure to other inmates, as such exposure increases the risk of infection. [51-3 at 29]. The nurse discussed with Plaintiff the importance of being housed in the medical unit as ordered by Dr. Faulks because of his decreased immunity due to the chemotherapy and his risk for infection. *Id*. at 30. Plaintiff verbalized understanding of the risks but he refused to be housed in the medical unit; he signed a refusal form which was properly witnessed. *Id*.

On December 21, 2012, Plaintiff was treated by Dr. Morris, who ordered a second round of chemotherapy. Defendant MTC has set forth a detailed list of Plaintiff's medical requests and visits on pages 2-7 of its Memorandum [52] in support of Summary Judgment from the date it took over management at EMCF, July 19, 2012, until Plaintiff was transferred on December 26, 2012, to Central Mississippi Correctional Facility ("CMCF"). This list accurately comports with Plaintiff's records and has not been disputed. Plaintiff was later transferred to South Mississippi Correctional Institution ("SMCI") and completed chemotherapy there. Plaintiff underwent another CAT scan, confirming that his cancer was in remission. [51-3 at 13].

All Defendants have moved for summary judgment as to Plaintiff's claims.

## II.  Standard of Review

"Summary judgment is appropriate if the moving party can show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States v. Renda Marine, Inc.,* 667 F.3d 651, 655 (5th Cir. 2012) (quoting Fed.R.Civ.P. 56(a)).  "A factual dispute is 'genuine' where a reasonable party would return a verdict for the nonmoving party."  *Chiu v. Plano Indep. Sch. Dist.,* 339 F.3d 273, 282 (5th Cir. 2003) (quoting *Lukan v. North Forest Indep. Sch. Dist.,* 183 F.3d 342, 345 (5th Cir. 1999)).  When considering a summary judgment motion, a court "must review all facts and evidence in the light most favorable to the non-moving party."  *Juino v. Livingston Parish Fire Dist. No. 5,* 717 F.3d 431, 433 (5th Cir. 2013).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003) (citing *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir. 2002)).

## III.  Denial and Delay of Medical Care

Plaintiff claims that Defendants denied him proper medical care in violation of his constitutional rights.  Inmates have an Eighth Amendment right to adequate medical care while incarcerated.  *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Rogers v. Boatright*, 709 F.3d 403, 409-410 (5th Cir. 2013).  However, mere disagreement with a prescribed course of medical treatment does not give rise to a Section 1983 claim, nor does medical malpractice.  *Gobert v. Caldwell*, 463 F.3d 339, 346

6

(5th Cir. 2006). A prison official violates the Eighth Amendment only when he is deliberately indifferent to an inmate's serious medical needs. *Rogers*, 709 F.3d at 409. "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference...." *Gobert*, 463 F.3d at 346.

     Although treatment may have been slow, Plaintiff's condition was diagnosed and proper medical care provided after the more conservative treatment for epididymitis was attempted. Plaintiff informed the treating physician of his family history of epididymitis, making it reasonable for Dr. Faulks to make this initial diagnosis. Although the diagnosis was later proven incorrect, and caused a delay in the cancer diagnosis, Plaintiff was, in fact, treated and not ignored. Plaintiff was seen and treated on the following dates prior to his surgery: July 13, 2012, August 8, 2012, September 6, 2012, September 24, 2012, October 17, 2012, and October 23, 2012. [51-2], [51-3], [51-4]. Though Plaintiff claims he was denied anti-nausea medication after his first chemotherapy treatment in December, the medical records provided reveal that because no prescription medication had been ordered, Plaintiff was given over the counter nausea medication when he complained of nausea on December 15, 2012. [51-3] at 28. The records indicate that Plaintiff was prescribed anti-nausea medication on December 18, 2012. [53-1] at 29. He also refused to be housed in the medical unit, as the medical staff advised, during his chemotherapy treatment.

     Plaintiff claims that he put in a sick call as early as June 1, 2012, but because the facility was on lockdown, he was not taken to medical. Finally, he refused to come in from yard call on or about July 13, 2012, in order to first receive any medical treatment. Although

7

unfortunate that the normal medical slip call procedure did not work, the lockdown obviously interfered with the normal sick call process within the prison. Even so, his refusal to come in was effective, and Plaintiff was seen by Dr. Marholan on or about July 13, 2012. The management of the prison changed from GEO to MTC within a week after this initial examination, and the changeover obviously caused an additional delay in Plaintiff's treatment.

Though it appears that Dr. Faulks's initial August 2012 diagnosis of epididymitis was incorrect, the diagnosis was reasonable due to family history. Even if negligent, medical malpractice does not establish a Section 1983 claim. There has been insufficient evidence presented that any Defendant actually *denied* Plaintiff medical care– as he was provided with medical care. Because the medical care provided was successful in treating his cancer, the only issue herein is whether the *delay* on the part of the medical staff established deliberate indifference. In hindsight, it is clear that Plaintiff could have had surgery and chemotherapy sooner. If the cancer had been diagnosed when Plaintiff first noticed his swollen testicle, on or about June 1, 2012, or on July 13, 2012, when he was seen by Dr. Marholan, the treatment would have been provided earlier. Yet the delay was less than five months from the time the first symptom occurred (June 1) until his surgery was performed (October 26). This Court must determine whether that *delay* on the part of the prison officials established the requisite "deliberate indifference" to Plaintiff's serious medical needs to violate the United States Constitution.

"The mere delay of medical care can ... constitute an Eighth Amendment violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Easter v.*

*Powell,* 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). *See also Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (delay must constitute "deliberate indifference"). Additionally, as the Fifth Circuit has stated, "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997). According to Plaintiff, Dr. Marholan recommended an ultrasound in June, but Dr. Faulks tried medication prior to allowing him to have an ultrasound. Negligent medical care simply does not constitute a valid section 1983 claim. *Mendoza,* 989 F.2d at 193. This is so even if the negligence includes failure to follow recommendations of another physician, so long as the treating physicians do not deny, substantially delay, or intentionally interfere with a plaintiff's medical treatment. *Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999).

Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-105.  There is no showing that Dr. Faulks intentionally denied or delayed Plaintiff's care– he simply made an initial incorrect diagnosis. Deliberate indifference is a difficult standard to show: a prison official must know that an inmate faces a substantial risk of serious harm and then disregard that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837 ("subjective recklessness as used in the criminal law" is the appropriate definition of "deliberate indifference"); *Reeves v. Collins,* 27 F.3d 174, 176 (5th Cir. 1994) (applying

*Farmer* to medical claims). The facts in Plaintiff's case confirm that no Defendant or Defendants' employee **intended** to inflict pain or harm of any kind– they merely failed to obtain quick medical care for him and failed to diagnose his cancer earlier.

The standard for finding "deliberate indifference" is a **subjective** inquiry, and the prisoner must show that the jail officials were **actually aware of the risk**, yet consciously disregarded or ignored it. *Farmer,* 511 U.S. at 837-839. Therefore, **actual knowledge and conscious disregard** of the risk of harm to the plaintiff is required before liability can be found. *Id.* Actual knowledge of the risk cannot be established on the part of Dr. Faulks, as his initial diagnosis of epididymitis was reasonable under the circumstances. No other prison officials actually were aware that Plaintiff could have had cancer, so no actual knowledge on their part could be established. Furthermore, deliberate indifference cannot be simply inferred from a prison official's mere failure to act reasonably, i.e., from negligence alone. *Lawson v. Dallas County*, 286 F.3d 257, 262-63 (2002), citing *Hare v. City of Corinth, MS*, 74 F.3d 633, 649 (5th Cir. 1996). Only under exceptional circumstances could a prison official's knowledge of a substantial risk of harm be inferred by the obviousness of the substantial risk. *Farmer,* 511 U.S. at 842-843. No risk of harm was obvious in Plaintiff's case— Dr. Faulks reasonably made another diagnosis which was medically supported.

There is no indication from the medical records that the delay in treatment resulted in the spread to the singular lymph node. Further, the medical records indicate that Plaintiff was seen multiple times by the medical staff, was prescribed antibiotics as well as anti-inflammatory pain relievers, and was ordered to have an ultrasound once initial treatment was

10

found to be ineffective. He was subsequently diagnosed with testicular cancer, and then referred to a urologist and oncologist. Surgery was performed to remove the mass, and he then successfully completed chemotherapy. Plaintiff is now in remission. Based upon the evidence, the delay in his medical care was not intentional, and no Defendant acted with deliberate indifference to his serious medical needs.

The Court finds two cases within this circuit regarding the medical care for prisoners with cancer, *Beddington v. Deen*, 487 Fed. Appx. 219 (5th Cir. 2012), and *Phillips v. Monroe County, Mississippi,* 311 F.3d 369 (5th Cir. 2002). *Beddington* involved colon cancer, and delayed treatment, whereas *Phillips* involved testicular cancer. The courts denied relief to the plaintiffs, finding no constitutional violation. The facts in each of these cases are distinguishable from the case at hand, and neither are controlling. Sadly, these cases resulted in the prisoners' deaths from the spread of cancer, and still no liability could be established. The cases confirm that the deliberate indifference standard is very difficult to show in medical delay cases. In Plaintiff's case, the diagnosis was made within a few months, and immediate surgery and chemotherapy were provided. The treatment successfully treated the "single pathologically enlarged lymph node," and no metastatic disease occurred. Thankfully, Plaintiff has recovered from his cancer. The result may have been the same even if the diagnosis and treatment had been provided a few months before. In any event, the Court finds that no prison official intentionally delayed Plaintiff's medical care or treatment— the delay occurred due to no more than negligence, partly due to the changeover in prison management.

It is certainly unfortunate that his diagnosis and treatment were delayed, but the applicable law requires that Plaintiff's claims be dismissed.

### IV. Conclusion

Based on the foregoing, Defendants' motions [49, 51, 58] are granted. A separate judgment will be entered in favor of all Defendants,

SO ORDERED, this the 27th day of March, 2015.

/s/   Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE